UNITED STATES, Appellee

v.

Jose L. MARTINEZ, Technical Sergeant
U.S. Air Force, Appellant.

No. 94–0021.
CMR No. 29440.

U.S. Court of Appeals for
the Armed Forces.

Argued April 25, 1995.

Decided Sept. 13, 1995.

For Appellant: *Captain Michael L. McIntyre* (argued); *Colonel Jay L. Cohen and Major George F. May* (on brief); *Lieutenant Colonel Joseph L. Heimann and Captain Stephen M. Shrewsbury* (Legal Intern).

For Appellee: *Captain Timothy G. Buxton* (argued); *Colonel Jeffery T. Infelise* (on brief); *Colonel Thomas E. Schlegel.*

*Amicus Curiae* on behalf of Appellant: *Cadet Second Class Linell A. Bartholic* (argued); *Captain James G. Bitzes and Cadet Second Class Charles F. McLean* (on brief)—For Clinical Appellate Program, U.S. Air Force Academy, Department of Law.

*Amicus Curiae* on behalf of Appellee: *Cadet Second Class Jeffrey E. Whitfield* (argued); *Major Norman K. Thompson* (on brief)—For Clinical Appellate Program, U.S. Air Force Academy, Department of Law.

1. *See* 41 MJ 213, 229 n. * (1994).

2. This case was argued at the Air Force Acade-

*Opinion of the Court*

SULLIVAN, Chief Judge:

1. During the spring of 1991, appellant, a technical sergeant, was tried by a general court-martial at Zaragoza Air Base, Spain. The members of his court-martial found him guilty of negligent homicide, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. On May 8, 1991, he was sentenced to a bad-conduct discharge, a fine of $1000, and reduction to E–1. The convening authority approved this sentence on August 9, 1991. The Court of Military Review[1] affirmed on May 3, 1993.

2. On May 26, 1994, this Court granted review[2] on the following issue raised by appellate defense counsel:

WHETHER APPELLANT'S CONVICTION WAS ADJUDGED DUE TO UNLAWFUL COMMAND INFLUENCE WHEN THE WING COMMANDER CIRCULATED A LETTER TO ALL COMMANDERS AND AGENCIES ON ZARAGOZA AIR BASE, EIGHT DAYS BEFORE APPELLANT'S TRIAL BEGAN, WHICH ESSENTIALLY TOLD THE COMMANDERS TO GET TOUGH ON DUI CASES AND ADMONISHED THEM NOT TO MISPERCEIVE HOW SERIOUSLY THE "WING LEADERSHIP" TAKES SUCH MATTERS.

We also specified the following issue for review:

WHETHER APPELLANT MAY BE CONVICTED OF NEGLIGENT HOMICIDE UNDER THE FACTS OF THIS CASE.

We hold that any unlawful command influence in this case was shown by the Government to be harmless beyond a reasonable doubt. *United States v. Thomas,* 22 MJ 388 (CMA 1986), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987). We also hold that the facts of this case permit appellant's conviction for negligent homicide, in violation of Article 134. *See United States v. Gordon,* 31 MJ 30 (CMA 1990); *United States v. Brown,* 22 MJ 448 (CMA 1986).

my. *See* 34 MJ 233, 234 n. * (CMA 1992).

3. The Court of Military Review found the following facts concerning the granted and specified issues:

In the early morning hours of 3 November 1990, Technical Sergeant Jose L. Martinez gave his car keys to Sergeant Sauceda so Sauceda could drive the two to a disco in downtown Zaragoza, Spain. Traveling toward town at about 3:00 A.M., the car flipped over into the oncoming lanes. Sergeant Sauceda was thrown from the vehicle and died as a result of his injuries.

\* \* \*

The appellant and Sergeant Sauceda gathered with some friends in Sauceda's dormitory room on 2 November 1990, to celebrate Sauceda's upcoming departure from Zaragoza Air Base. After sharing a one-liter bottle of whiskey, the group went to the Noncommissioned Officers' (NCO) Club where they bought a few more rounds of drinks. Then, they went to the base dining hall for some food. When they left the dining hall, the appellant and Sauceda returned to Sauceda's dormitory. Between 1:30 and 2:00 A.M., Sauceda was seen "staggering" in the dormitory's shared bathroom. A female friend he called about 2:30 A.M., said he sounded "very drunk." *Soon thereafter, the appellant gave his keys to Sauceda who drove the two off the base in the appellant's car.*

\* \* \*

On 5 March 1991, the Zaragoza wing commander issued a "We Care About You" letter to his command after a series of alcohol-related accidents, presumably including this one, resulted in several deaths. The letter expressed the wing leadership's concerns and reviewed the administrative and nonjudicial measures being set in motion to reduce alcohol-related incidents.

We differ with the appellate defense counsel's assessment that "this letter cast an atmosphere of command influence that hung over appellant's trial like the Sword of Damocles." The letter specifically says that "Punishment for DUI [driving under

the influence] will be individualized under the guidelines of the UCMJ." As counsel suggests, the letter was circulated across the base "eight days before the appellant's trial began." However, due to the delays ..., the members were not actually empaneled until almost 2 months after the letter was written. Then, in an extensive *voir dire*, the members stated repeatedly they would only consider the facts of the case before them. Their actions remained fair and impartial throughout the trial. We find nothing from the 5 March letter that had the impermissible effect of bringing "the commander into the deliberation room," and nothing amounting to unlawful command influence over these proceedings. *United States v. Kirkpatrick*, 33 MJ 132, 133 (CMA 1991); *United States v. Grady*, 15 MJ 275, 276 (CMA 1983); *United States v. Fowle*, 7 USCMA 349, 351, 22 CMR 139, 141 (1956).

Unpub. op. at 1–2, 8 (emphasis added).

— — —

I

4. Appellant was charged with involuntary manslaughter, in violation of Article 119, UCMJ, 10 USC § 919. In particular, he was charged with *"by culpable negligence*, unlawfully kill[ing] Staff Sergeant Armando Sauceda by allowing Sergeant Armando Sauceda to drive [appellant's] vehicle while under the influence of alcohol." (Emphasis added.) The maximum punishment for this offense was a dishonorable discharge, confinement for 3 years, and total forfeitures.[3] Para. 44e(2), Part IV, Manual for Courts–Martial, United States, 1984. The members, however, found appellant guilty of the lesser offense of negligent homicide, in violation of Article 134. In particular, he was found guilty of "unlawfully kill[ing] Sergeant Armando Sauceda by *negligently* allowing Sergeant Armando Sauceda to drive [appellant's] vehicle while under the influence of alcohol." (Emphasis added.) The maximum punishment for this offense is a bad-conduct dis-

---

**3.** This has been changed effective for offenses committed after December 9, 1994. Exec. Order No. 12, 936, § 4(c), 59 Fed.Reg. 59081.

charge, confinement for 1 year, and total forfeitures. Para. 85e, Part IV, Manual, *supra.*

5. On appeal appellate defense counsel asserts that appellant cannot be convicted of negligent homicide for lending his car to a drunken driver who kills himself in an automobile accident. He first argues that such conduct is not criminal in any jurisdiction, civilian or military. *Cf. United States v. Brown,* 22 MJ 448 (CMA 1986)(conviction of servicemember for involuntary manslaughter upheld for death of a third person killed by drunken driver given keys by that servicemember). He further contends that, even if such conduct was criminal in the military, he had no notice of its criminality. Finally, he asserts that "public policy" dictates that Article 134 should not be expansively construed by this Court to criminalize his conduct.

■ 6. We note that it has long been established in military law that negligent homicide is a punishable service disorder under Article 134. *See United States v. Kick,* 7 MJ 82, 84 (1979). There, this Court said:

Article 134, UCMJ, and its statutory predecessor Article of War 96, proscribe all disorders and neglects by a member of the services which prejudice the good order and discipline in the armed forces and all conduct of a nature to bring discredit upon the armed forces. It must be construed in light of authoritative interpretations of military law, existing service customs and common usages. *See Parker v. Levy, supra,* 417 U.S. [733] at 753–54, 94 S.Ct. 2547 [at 2560–61], 41 L.Ed.2d 439 [ (1974) ]; *Dynes v. Hoover,* 61 U.S. (20 How.) 65, 15 L.Ed. 838 (1857). This Court in *United States v. Kirchner,* 1 USCMA 477, 4 CMR 69 (1952), specifically found that negligent homicide by a service member could be properly punished under Article 134, UCMJ, as such a disorder. Past

court-martial practices with respect to the prosecution of negligent homicide under Article of War 96, and up to that time under Article 134, UCMJ, were noted in detail in that opinion. A more recent decision from the United States Army Court of Military Review clearly articulated the reasons for its prosecution under Article 134, UCMJ:

There is a special need in the military to make the killing of another as a result of simple negligence a criminal act. This is because of the extensive use, handling and operation in the course of official duties of such dangerous instruments as weapons, explosives, aircraft, vehicles, and the like. The danger to others from careless acts is so great that society demands protection.

*United States v. Ballew,* CM 434077 (unpublished), p. 2 (ACMR 16 July 1976). (Footnotes omitted.)

■ 7. Appellant asserts, however: "There is no known case in any jurisdiction of anyone being convicted of homicide for letting an intoxicated person drive his vehicle where that person then died as a result of his own negligence." Final Brief at 10. Be that as it may, we noted in *United States v. Kick, supra* at 83–84, that the absence of civilian law proscribing this conduct is not determinative. Instead, our concern is whether this conduct violates substantive military law which in turn rests on military tradition, necessity, and experience. *See Parker v. Levy,* 417 U.S. 733, 749–51, 94 S.Ct. 2547, 2558–59, 41 L.Ed.2d 439 (1974). The decisions of this Court in *United States v. Brown,* 22 MJ 448 (1986), and *United States v. Gordon,* 31 MJ 30 (1990), clearly recognized the negligence inherent in appellant's conduct [4] and the appropriateness of including such hazardous conduct toward a fellow soldier [5] within the scope of Article 134. *See*

---

4. Judge Cox aptly noted the nature of this negligence in *United States v. Brown,* 22 MJ 448, 450 (CMA 1986). He said:

Heedlessly turning over the keys to his chariot of death, appellant did not even take the elemental precaution of inquiring how much alcohol Robinson [the driver] had actually consumed.

5. The Bible (Genesis 4:9) asks the question, "Am I my brother's keeper?" In my personal view, within the confines of this case, this question is to be answered in the affirmative. There are instances in military life where the high standards set for membership in the profession of arms require that Armed Forces members not only take care of themselves but also their fellow

*generally Solorio v. United States,* 483 U.S. 435, 107 S.Ct. 2924, 97 L.Ed.2d 364 (1987) (Uniform Code of Military Justice applies to servicemember's conduct no matter where it occurs.)

■ 8. Appellant next asserts that even if his conduct was proscribed by Article 134, he had no notice of its criminality. This argument must be rejected for the reasons stated by the Supreme Court in *Parker v. Levy, supra.* Appropriate notice was provided by our decisions noted above and paragraph 85, Part IV, Manual, *supra.*

■ 9. Appellant's final argument is that the criminalization of his conduct by this Court would be "against public policy." He notes the absence of statutes creating criminal liability for behavior such as appellant's and suggests that it is "undesirable" to "have a duty to protect the health and safety of another who chooses, and is allowed, to drink and drive .…" and "kill[s] themselves as a result of their own negligence." He urges that this Court leave such policy decisions to Congress in its future modifications of the Uniform Code of Military Justice. Final Brief at 20–22.

■ 10. Appellant's argument ignores the fact that this Court does not make or set public policy. That is Congress' job under Article I, § 8, Clause 14 of the United States Constitution, and it has performed its duty in this regard by enacting Article 134 and its statutory predecessors. That legislative body placed the responsibility on the factfinder at a court-martial to determine whether conduct such as appellant's is a service disorder punishable at a court-martial. The Supreme Court has also held that this statute is constitutional, assuming adequate notice is provided with respect to the particular offenses punished under it. *See Parker v. Levy, supra.* Finally, the President in the Manual for Courts–Martial has long recognized the offense of negligent homicide as a

punishable service disorder. *See* Appendix 6c, Sample Specification 144, Manual for Courts–Martial, United States, 1951. Our authority is limited to examining the findings of guilty entered under this codal provision and ensuring that they comply with existing law. Art. 67(c), UCMJ, 10 USC § 867(c)(1989). They do here.

## II

11. The second issue in this case is whether appellant's wing commander unlawfully influenced his court-martial such that its findings and sentence should be set aside. *See* Art. 37(a), UCMJ, 10 USC § 837(a); *United States v. Kirkpatrick,* 33 MJ 132 (CMA 1991). The basis for this attack on appellant's conviction is a "We Care About You" letter dated March 5, 1991, signed by Colonel Mangis, Commander, 406th Tactical Fighter Training Wing (USAFE). This letter was issued 8 days before the initial Article 39(a), UCMJ, 10 USC § 839(a), session in this case and essentially announced "a get tough on DUI cases" policy for Zaragoza Air Base. (*See* appendix.)

12. Appellate defense counsel asserts that "the decision of the Air Force Court of Review evidences a complete failure to conduct a thorough review of the record and meaningful analysis of this issue." Final Brief at 25. He notes that all the members of appellant's court-martial admitted that they were aware of the "get tough" policy and, therefore, it was readily apparent to any reasonable person that the commander was "dictating the results" of his client's trial. Final Brief at 31, 32. He finally asserts that "this case would not have gone to court if it occurred at any other time or at any other base in the military." Final Brief at 34. We disagree.

13. Taking his last argument first, we note that the decision to refer this case to trial by court-martial was that of Major Gen-

warriors. *See United States v. Lawson,* 36 MJ 415 (CMA 1993); *cf.* the national slogan "Friends don't let friends drive drunk" (somewhat related civilian concept). I think the high standards of conduct are traits of the American soldier. I think these standards are major fac-

tors in the high regard that America's Armed Forces enjoy in the world today. Again, in my view, *the instant case reflects these high standards of conduct that the American military sets for itself under the authority granted in the Uniform Code of Military Justice.*

eral Daniel, Commander, Sixteenth Air Force (USAFE), Torrejon Air Base, Spain. It is not clear how a "get tough on DUI cases" letter from Colonel Mangis, a commander of lower grade, would influence his superior officer's referral decision. *United States v. Johnston*, 39 MJ 242 (CMA 1994). Furthermore, we have reviewed this letter, which is attached as an appendix to this opinion, and conclude that it conveys no express or implied message that appellant or any other presumably innocent servicemember should be found guilty without regard to the evidence presented at a court-martial. Finally, with respect to sentence, we note this policy letter was not directed at this court-martial to ensure that severe punishments for drunk-driving offenses be imposed by the court-members. *See United States v. Kropf*, 39 MJ 107, 109 (CMA 1994); *cf. United States v. Kirkpatrick*, 33 MJ 132 (CMA 1991)(military judge instructs members on command policy); *United States v. Grady*, 15 MJ 275 (CMA 1983)(trial counsel argued command policy to members).

■ 14. Admittedly, this policy letter suggests to potential court members reading it what their court-martial sentences for a drinking-and-driving offense should be. This is unlawful command influence in violation of Article 37. Nevertheless, in *United States v. Thomas*, 22 MJ 388 (1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987), this Court rejected a *per se* reversal rule where the members of a court-martial were simply exposed to comments suggesting unlawful command influence. *See also United ed States v. Allen*, 33 MJ 209 (CMA 1991)(rejected *per se* rule where applied to military judge), *cert. denied*, 503 U.S. 936, 112 S.Ct. 1473, 117 L.Ed.2d 617 (1992). Instead, this Court has held that full disclosure of the matter on the record; assessment of the members' ability to render an impartial judgment; and proper instruction on the members' judicial duty would normally suffice to ensure a military accused has a fair trial. This case complies with that decision.[6]

■ 15. Nevertheless, we are puzzled by the wing staff judge advocate (SJA)'s apparent failure to make it "absolutely clear" to the members of this command that courts-martial were not covered by this letter. *Cf. United States v. Sullivan*, 26 MJ 442 (CMA 1988). When one reads paragraph 2(d) of this letter (*see* appendix), one might think that the commander is setting out a minimum punishment schedule for courts-martial. Where was the SJA? We know the typical SJA is not a "potted plant."[7] SJAs should be constantly vigilant to avoid such loose or ambiguous language in a command-wide policy letter from the commander. In any event, we are satisfied beyond a reasonable doubt

6. The military judge stated to counsel:

All right. I have previously denied your motion for a change of venue until we had a chance to *voir dire* the panel members. Having heard the members' responses, I again will deny the motion for a change of venue. I am aware that all the members perceive the wing commander's policy as a result of all these deaths from DWIs as a serious matter and a get tough policy. I don't find that, in itself, disqualifying. It would be disqualifying if any of these members felt that as a result of that policy they had to vote in a particular way or reach a particular finding. I think of those members of whom that question was asked, I don't think we have any members who feel constrained by that commander's policy to have to vote or decide in a particular manner.

So, I don't see in this particular case, as a result of what knowledge the members do have, if any, of the accused and this accident, of the commander's policy, that there is such a great prejudice that the accused cannot obtain a fair and impartial trial. For that reason, the motion for a change of venue is denied.

7. The term "potted plant" is used in America's image-based society to distinguish passive non-players ("is a potted plant") from people of action ("is not a potted plant"). It is derived from Brendan V. Sullivan, Jr.'s, response to Senator Inouye, when the Senator was attempting to limit Mr. Sullivan's role in protecting his client (Oliver North) from what Mr. Sullivan perceived as unfair questioning by the Senate staff during the 1987 Irangate Hearings: "Well sir, I'm not a potted plant. I'm here as the lawyer. That's my job."

that appellant was not prejudiced by the wing commander's letter. *United States v. Thomas, supra.*

The decision of the United States Air Force Court of Military Review is affirmed.

Judges COX, CRAWFORD, and GIERKE concur.

APPENDIX

**DEPARTMENT OF THE AIR FORCE**
HEADQUARTERS 406TH TACTICAL FIGHTER TRAINING WING (USAFE)
APO NEW YORK 09286-5000

REPLY TO
ATTN OF  CC

SUBJECT  "We Care About You"                                0 5 MAR 1991

TO  Distribution A-C

1. Following our recent tragic vehicle accidents, I feel it is necessary to take significant actions. We, as individuals, as a community, or as an Air Force cannot accept this type of loss. First, I believe that we have a good set of programs for accident prevention, and for control of alcohol use. The failure seems to be in individual application or in perception of how serious wing leadership takes them. To make it absolutely clear, I am taking the following actions and instituting the following programs.

2. First, the negative:

a. The unit commanders and first sergeants from the units which had the recent fatalities will present a complete briefing, on their participant's(s') involvement in the accident, to the CC/CV/DCSs/SEA no later than 5 Mar 91.

b. In all DUI cases, beginning with the most recent on 13 Feb 91, the DCS, unit commander, first sergeant, driver, and any passengers will brief the senior staff the second wing staff meeting from the date of the incident.

c. The wing standard for DUI will be loss of all on and off base driving privileges for one year. Spanish drivers licenses obtained through the 406 TFTW will be returned to the Security Police Pass & ID office for safekeeping. This is retroactive for all persons currently under suspension. In specific cases where I deem it necessary for performance of duties, GOV driving waivers may be given. These requests will come through the DCSs.

d. Punishment for DUI will be individualized under the guidelines of the UCMJ. For a first-time offender committing an Article 111, UCMJ violation with no personal injuries or property damage, an appropriate punishment should be given. I consider the following as a starting point:

1) NCOS - Reduction in grade and forfeiture of $500.

2) Officers - Forfeiture of $1,500.

3. Second, the preventive:

a. All people involved in alcohol-related incidents will be referred to Social Actions for an evaluation.

*Right People. Right Mission. Right Now.*

b. Unit commanders and first sergeants will review the records of all assigned personnel to identify those with poor driving history. They will also attempt to identify those with proven poor driving attitudes. These individuals will be counseled and disciplined, as necessary. A record of counseling will be kept.

c. Unit commanders will document a counseling session with all personnel reaching two months from PCS or upon Early Return of Dependents, which emphasizes the high risk during these periods. They and unit first sergeants will monitor the off-duty actions of these individuals to identify excessive behaviors.

d. The NCO Club bar will stop serving alcoholic drinks at midnight. Non-alcoholic drinks, food, and entertainment may continue as late as desired.

e. A senior NCO will be assigned duty to observe the NCO Club bar. The duties will include:

1) Advising people who are getting drunk to take it easy.

2) Advising people leaving who appear to be under the influence to not drive.

3) Calling the Security Police if people fail to take advice.

f. We will institute a process of driving through cones/random checks of people entering and departing Base as sobriety tests.

g. Security police and selected officers/NCOs will join in random checks for seat belt use. Warnings will not be given. Violators of my seat belt policy letter will be given the five day/30 day/one year driving suspension.

4. Finally, the positive is that we will initiate a "We Care About You" program which encompasses all of the present programs plus:

a. Publishing a "Safe Partying" guideline.

b. Developing a safe presentation on the effects/dangers of alcohol use, indicators of alcohol abuse, intelligent ways to use alcohol, and smart ways to party which will be given at all unit commander's calls.

c. Increasing emphasis on identifying potential alcohol abusers before a serious problem develops or the person gets into trouble.

d. Placing specific emphasis on removing peer pressure to drink or drink more.

e. Establishing a wing policy that the unit commander/DCS will personally approve the type/quantity of alcohol served at unit functions. Non-alcoholic beverages will not only be offered, but pushed. Non-alcoholic wine will be available on every table where wine is offered.

5. These actions are sharp, but not extreme. I believe, however, that they take advantage of the very unfortunate opportunity that our fine young comrades gave us. No program will prevent a reoccurrence. Only a significant change in the social mindset of our people can accomplish that most desirable of ends. We must decide, as a community and as individuals, that irresponsible drinking and irresponsible driving are just not acceptable. I have done my part as commander. Now I plead with each of you to join me as individuals to make sure that we never suffer tragedies like these again.

EDWARD V. MANGIS, Colonel, USAF
Commander

WISS, Judge (concurring):

16. As to the granted issue, I agree with the majority's treatment of appellant's claims made thereunder. Also, I agree with its conclusion as to the specified issue that, notwithstanding an absence of prejudice in appellant's court-martial, the complained-of portion of the commander's letter was an unlawful command effort to exert influence over courts-martial, including appellant's. *See* Art. 37(a), Uniform Code of Military Justice, 10 USC § 837(a).

17. I write separately to address an aspect of the granted issue that troubles me considerably in this case—but one which the defense did not surface at trial and did not pursue on appeal. It has to do with the relationship among the concepts of proximate cause, immediate cause, independent and intervening cause, and contributory negligence. In my opinion, this case illustrates the need for military judges to be especially sensitive to the duty to tailor instructions to the evidence in the case. *Cf. United States v. Martinez,* 40 MJ 426, 431 (CMA 1994); *United States v. Groce,* 3 MJ 369, 370–71 (CMA 1977). That extra effort will help members *understand* instructions within the context of the evidence they have heard—instructions that, when given in general terms, seem overly complex and convoluted.

I

18. The evidentiary contest at trial focused on whether the victim was impaired by alcohol and, relatedly, whether appellant knew of the impairment; and whether the victim was contributorily negligent so as to sever the proximate-cause linkage between appellant's negligence and the victim's death. The alleged negligence of the victim himself included, in addition to his drunkenness and his driving while in that state: not wearing a seat belt at the time of the accident; wearing sunglasses while driving at night, thereby reducing his vision; and not using the high beam on the car's headlights, which further reduced his ability to see.

19. After defining and contrasting culpable negligence (required for the charged offense of involuntary manslaughter) and simple negligence (required for the lesser-included offense of negligent homicide), the military judge offered these instructions:

In argument counsel mentioned the terms "proximate cause," "intervening cause." The act of the accused in this case must not only amount to culpable negligence, but must also be a proximate cause of the death of Sergeant Sauceda. Proximate cause means that the death must have been the natural and probable result of the accused's culpably negligent act. The *proximate cause* does not have to be the only cause, but it *must be a contributory cause which plays an important part in bringing about the death. Now, if the death of Sergeant Sauceda occurred only because of some unforeseeable, independent, intervening cause which did not involve the accused,* then the accused may not be convicted of involuntary manslaughter. Again, *the burden is on the prosecu-*

tion to prove beyond a reasonable doubt that there was no intervening independent cause, and that the accused's culpable negligence was a proximate cause of the victim's death. Any questions about that instruction, gentlemen? Okay, no questions. *Finally, there is evidence in this case raising the issue of whether the deceased, Sergeant Sauceda, failed to use reasonable care and caution for his own safety. If the accused's culpable negligence was a proximate cause of death, then the accused is not relieved of criminal responsibility just because the negligence of the deceased may also have contributed to his death.* The conduct of the accused [DE-CEASED?] is, however, important on the issue of whether the accused's culpable negligence, if any, was the proximate cause of death. Accordingly, a certain act may be a proximate cause of death even if it was not the only cause, as long as it is a direct or contributing cause and plays an important role in causing the death. *An act is not a proximate cause of death if some other force independent of the accused's act intervened as a cause of death.* Is that instruction clear?

\*        \*        \*

Now as the facts in this case relate to this lesser-included offense [of negligent homicide], the matters of proximate cause and intervening cause also apply to the lesser-included offense. That is, the act alleged must not wholly [ONLY?] amount to simple negligence, but it must be the proximate cause of Sergeant Sauceda's death. This means that the death of Sergeant Sauceda must have been the natural and probable result of the accused's negligent act. In determining this issue, you should consider all facts and circumstances. *Now the accused will be relieved of criminal responsibility for the death of the victim if the death was the result, again, of some unforeseeable, independent intervening cause which did not involve the accused. If the victim died only because of this independent intervening cause, then the act of the accused was not the proximate cause of the death, and the accused cannot be found guilty of negligent homicide. Again, the burden is on the govern-*

*ment* to establish beyond a reasonable doubt that there was no independent intervening cause and that the accused's negligence was a proximate cause of the death of the victim.

Finally, as it may relate to any issue of contributory negligence in this case, there is some evidence in this case which raises the issue of whether the deceased, again, failed to use reasonable care and caution for his own safety. *If the accused's negligence was a proximate cause of the death, the accused is not relieved of criminal responsibility just because the negligence of the deceased may have contributed to the death.* The conduct of the deceased is, however, again important on the issue of whether the accused's negligence, if any, was a proximate cause of death. Accordingly, a certain act may be a proximate cause of death, even if it is not the only cause, as long as it is a direct or contributing cause and plays an important role in causing the death. Thus an act is not the proximate cause of the death if there is that other force independent of the accused's act which in that other force intervened as the cause of death.

(Emphasis added.)

20. After the members had deliberated for about 2 hours, they returned to court to ask for a lunch break. The request granted, the members reconvened about an hour later with a request that, prior to continuation of deliberations, the military judge "go over with us again the definitions of simple and culpable negligence."

21. The military judge repeated the instructions that he had given earlier on these subjects and, again at the members' request, reinstructed on certain voting procedures and on the elements of involuntary manslaughter. Regarding the elements, the military judge instructed, in part, that the members had to find that "the death [of Sergeant Sauceda] resulted from an act of the accused, in this case giving his keys to the deceased while the deceased was under the influence of alcohol. . . ."

22. At this point, the members renewed their deliberations. Nearly 2½ hours later

338

they returned with a finding of guilty of the lesser-included offense of negligent homicide.

## II

23. Except as to the capitalized words in brackets in the quoted instruction, ¶ 19, the instructions on negligence, proximate cause, intervening cause, and contributory negligence substantially followed the model instructions on those subjects found in paragraphs 3–88 and 3–154, Military Judges' Benchbook at 3–177 and 3–309 (Dept. of the Army Pamphlet 27–9 (Change 2) (15 Oct. 1986)). I take no issue here with those instructions, either as to their correctness or, in most instances, as to their adequacy.

24. In some cases, however, the evidence that the members must sort out to find the facts is so complex that common sense ought to suggest that the military judge should tailor these technical and conceptual instructions so that the members can *understand what they mean* in the context of the case at hand. I believe that this is such an instance.

25. For example, if not at the outset then at least when the members indicated their confusion by returning to the courtroom for reinstruction, the military judge should have considered instructions substantially as follows:

> In order to find the accused guilty of the charge of either involuntary manslaughter or negligent homicide, you must find:
> FIRST: that the victim's drunkenness—rather than some unforeseeable, independent, intervening force—was the immediate cause of the accident that resulted in his death; and,
> SECOND: that the accused knew or should have known that the victim was drunk, as I have defined that term for you; and,
> THIRD: that the accused was negligent in giving his keys to the victim, considering the accused's state of knowledge of the victim's condition, and that negligence was the proximate cause (as I have defined that term for you) of the accident and death; and
> FOURTH: that the victim's drunkenness, his failure to wear a seat belt, and his

> actions that affirmatively diminished his ability to see (that is, his wearing tinted glasses while driving at night and his failure to use the high beams on the car's headlights)—if you find these as facts—*was not* contributory negligence; or
> If you find these facts and determine that the victim *was* contributorily negligent, then you must further find that his negligence did not "loom so large" in comparison with the accused's negligence that the accused's negligence did not play an important role in causing the death. That is, that the victim's contributory negligence was not so substantial in comparison with the accused's negligence that it effectively severed the accused's negligence as a proximate cause of the accident leading to the victim's death.

(This is not a quotation.)

26. In other words, even if appellant was negligent in giving his keys to a person he knew or should have known was intoxicated, that negligence is not a proximate cause of the subsequent accident and death unless the driver's drunkenness, itself, was the immediate cause of the accident. If, notwithstanding the driver's intoxication, the accident occurred due to some other circumstance, then appellant's negligence is not a proximate cause. Judge Cox, writing for a unanimous Court in *United States v. Lingenfelter,* 30 MJ 302, 306 (1990), offered these analogous illustrations:

> For example, had it been a parachutist that dropped suddenly out of the sky in front of appellant's vehicle (assuming appellant had no reason to know he was in the middle of a drop zone) and had the circumstances been such that no one driving lawfully and exercising all due care could have avoided striking the parachutist given the minimal notice, it would not have been the fact of the drunken driving that "thereby caused" the injury.
> Similarly, if one bent on self-destruction had hidden behind an obstacle by the roadside and had hurled himself into appellant's on-rushing vehicle, and the same result would have occurred had the driver been sober and driving with all due care, it

would not have been the fact of the drunken driving that "thereby caused" the injury. . . .

27. Further, even if appellant was negligent, if the victim was contributorily negligent and if that contributory negligence was so substantial, when compared to the accused's negligence, that the latter became relatively unimportant as a contributing cause, then appellant's negligence was not a proximate cause. As Judge Cox wrote in *Lingenfelter,* after a short discussion of *United States v. Cooke,* 18 MJ 152 (CMA 1984):

> Whether appellant's drunken driving "play[ed] a material role in" Mr. Strubbe's demise or whether Mr. Strubbe's own alleged negligence "loom[ed] so large" as to relegate appellant's conduct to less than "a substantial factor in the" death are calls to be made in the first instance by the factfinder.

30 MJ at 307. As applied to this case: Whether appellant's negligence in giving his car keys to his drunk friend played a material role in the subsequent accident and death of his friend—or whether, instead, his friend's own negligence in driving while intoxicated, without wearing a seat belt, while wearing glasses with tinted lenses at night, and not using the high beams on the car, "loom[ed] so large" as to relegate appellant's negligence to less than "a substantial factor in the" accident and resultant death—are calls for the members to make.

### III

28. As I mentioned at the outset of this opinion, however, appellant lodged no objection to any of the relevant instructions nor asked for any more-tailored ones. Even on appeal, the thrust of his complaints is not the absence of understandable instructions, made so by being tailored to the evidentiary context of the case. Since the instructions that were given are legally correct and not so convoluted as to be ineffective, I conclude that there is no appellate error worthy of reversal.

29. Nonetheless, I encourage military judges to use the opportunity in their instructions to offer truly helpful guidance to the members and to make sense, in the context of the case at hand, out of instructions that are frequently fraught with unfamiliar concepts, terms of art, or other legalese.