UNITED STATES, Appellee,

v.

Stacie E. YOUNGBLOOD, Airman First Class, U.S. Air Force, Appellant.

No. 96–1256.
Crim.App. No. 31617.

U.S. Court of Appeals for the Armed Forces.

Argued May 14, 1997.

Decided Sept. 30, 1997.

Sullivan, J., filed opinion concurring in part and dissenting in part.

Crawford, J., filed dissenting opinion.

For Appellant: *Captain W. Craig Mullen* (argued); *Lieutenant Colonel Kim L. Sheffield* (on brief); *Colonel David W. Madsen.*

For Appellee: *Captain Libby A. Brown* (argued); *Colonel Theodore J. Fink, Lieutenant Colonel Michael J. Breslin,* and *Major LeEllen Coacher* (on brief).

*Opinion of the Court*

GIERKE, Judge:

A general court-martial composed of officer and enlisted members convicted appellant, pursuant to her pleas, of one specification each of wrongful distribution of lysergic acid diethylamide (LSD), wrongful use of LSD, wrongful use of psilocybin, larceny of military property, and wrongfully giving an altered military identification card to another airman, and 2 specifications of wrongfully altering military identification cards, in violation of Articles 112a, 121, and 134, Uniform

Code of Military Justice, 10 USC §§ 912a, 921, and 934, respectively. The court-martial sentenced appellant to a bad-conduct discharge, confinement and forfeiture of $800.00 pay per month for 2 years, and reduction to the lowest enlisted grade. The convening authority reduced the forfeitures to $600.00 pay per month for 24 months but otherwise approved the sentence. The Court of Criminal Appeals affirmed the findings and sentence in an unpublished opinion.

Our Court granted review of the following issues:

## I

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY REFUSING TO GRANT THE CHALLENGES FOR CAUSE AGAINST TWO MEMBERS WHO HAD RECEIVED A BRIEFING FROM THE SPECIAL COURT–MARTIAL CONVENING AUTHORITY CONCERNING THE STATE OF DISCIPLINE IN THE UNIT AND THE SPECIAL COURT–MARTIAL CONVENING AUTHORITY'S VIEWS OF "APPROPRIATE" LEVELS OF PUNISHMENT.

## II

WHETHER APPELLANT'S SENTENCE SHOULD BE SET ASIDE DUE TO UNLAWFUL COMMAND INFLUENCE BY THE SPECIAL COURT–MARTIAL CONVENING AUTHORITY AND HIS STAFF JUDGE ADVOCATE WHEN, 10 DAYS PRIOR TO TRIAL, THEY CONDUCTED A BRIEFING, ATTENDED BY MEMBERS OF THIS COURT–MARTIAL, ON "APPROPRIATE" LEVELS OF PUNISHMENT AND IMPLIED THAT THERE COULD BE ADVERSE CONSEQUENCES FOR FAILING TO COMPLY WITH THEIR VIEWS.

We hold that the military judge erred by refusing to grant the challenges for cause. In light of this holding, we do not decide the second granted issue.

The issues arose as a result of remarks made during a staff meeting several days before the trial. The remarks were attributed to Brigadier General (BGen) Marr, Commander of 62d Airlift Wing, and his staff judge advocate (SJA), Lieutenant Colonel (LtCol) Rollinger. The staff meeting covered a variety of topics, including a 15–20 minute presentation on standards, command responsibility, and discipline. The three most senior members of the court-martial panel were present during the command briefing. Neither BGen Marr nor LtCol Rollinger was asked to testify at trial by either party, but during *voir dire* the three court members who attended the meeting described their perception of those remarks. Because Issue I concerns the members' impartiality, our focus is on the impact of the remarks on the members rather than the exact language, intentions, or motivations of the speakers.

LtCol Snyder was asked during *voir dire* if he could judge appellant's case based on the evidence and with an open mind. He responded in the affirmative but then explained:

> Now, the nature of being a commander, you're always having to make decisions and justify them at a minimum in your own mind, if not to your boss and the boss's commander, which is General Marr. An influence that—most recently we had a commanders' conference with General Marr where Colonel Rollinger, the Staff Judge Advocate, talked about, you know, standards.... So, there are always those pressures that are inherent with the job that you are weighing advice from the first sergeant, influences from things that you hear at the stand-up, from Colonel Kane, my boss, or General Marr, his boss, giving opinions on what they think is important with regard to the good order and discipline of their unit and your specific unit.
>
> So, yes, I think I can be fair and impartial in this case, but there are factors that are just inherent with the job that are influences that I know enter into anyone in a command position.

Turning to the specific remarks at issue, LtCol Snyder described LtCol Rollinger's briefing as "of a general nature," involving "illustrative examples of types of punishments and types of actions that commanders had taken." He said that LtCol Rollinger mentioned one specific example, involving child abuse, where, "in Colonel Rollinger's opinion, the commander underreacted" and "had shirked his or her leadership responsibilities."

LtCol Snyder said that BGen Marr also addressed the issue, telling the assembled officers "that we should use the SJA because he speaks for the Wing Commander." With respect to the specific example cited by LtCol Rollinger, BGen Marr said that he had forwarded a letter to that commander's new duty location expressing the opinion that "that officer had peaked."

When asked if he felt that he would be subject to command influence if he voted for a sentence of "no punishment," LtCol Snyder responded in the negative. He then volunteered that on one occasion he approached BGen Marr and explained his actions after taking disciplinary action that he did not think BGen Marr would agree with.

When asked if he would worry about a letter to a future superior that would cause his career to "peak," LtCol Snyder responded that he would do what was right but that the remarks at the staff conference were "at a minimum in my subconscious and, you know, parts of it are very clearly in my conscious."

A second member, Major (Maj) Taylor, remembered LtCol Rollinger describing a case involving sexual abuse of a child where the commander "did not act as he should have." According to Maj Taylor, LtCol Rollinger "said that he thought the commander probably should have been given an Article 15 for dereliction of duty and removed of his position." Maj Taylor said that BGen Marr followed up with "a comment to the effect of, you know, that something on the order of he's contacted or planning to contact the person that this previous commander worked for and that person's career in the Air Force

is probably not going to be a very lengthy one."

When questioned about the impact of the remarks, Maj Taylor responded that she looks to the SJA for guidance and advice but that she is responsible for making the decision. She said, "I feel that my opinion is my opinion. Although it can be somewhat influenced by guidance and information out there, but it's ultimately mine and I'm comfortable with that."

On questioning by defense counsel, Maj Taylor explained, "I took away [from the staff meeting] what was the [SJA's], Colonel Rollinger's, opinion. I took away from there that the commander still has the ultimate responsibility to make the decision, administer the discipline, and that the Legal Office offered advice and guidance."

A third member, LtCol MacPherson, remembered that LtCol Rollinger gave a presentation on the commander's responsibility for maintaining good order and discipline. He said that LtCol Rollinger did give examples but that he would "have to think about it to come up with" them. LtCol MacPherson remembered that BGen Marr said that he "expected the commanders to be responsible for maintaining the order and discipline of their unit and that was their job, and that anybody that didn't, he didn't—they were appointed to the position because he expected them to maintain that and that was their charge when he put them in there."

LtCol MacPherson said that he did not remember LtCol Rollinger commenting about an officer's career, but he did remember that BGen Marr mentioned sending a letter to a former commander's superior. When defense counsel asked LtCol MacPherson whether he had the impression that the officer in question "was going to suffer adverse consequences to his career," he responded, "The impression definitely was there. The way it was left with me was there was a presentation, the Wing Commander was dissatisfied with the way things had happened and he wrote a letter to the individual's now present supervisor."

Defense counsel challenged LtCol MacPherson, LtCol Snyder, and Maj Taylor for

cause. The military judge granted the challenge of LtCol Snyder but denied the other two.

Appellant now asserts that the military judge abused his discretion by refusing to grant the challenges for cause against LtCol MacPherson and Maj Taylor. He argues that the challenged members "could not be expected to ignore" the comments of BGen Marr, "especially in light of the actions taken against the offending commander." Final Brief at 8. The Government argues that the military judge did not abuse his discretion and that removal of "the only member potentially affected eliminated any concerns about command influence." Answer to Final Brief at 2.

RCM 912(f)(1)(N), Manual for Courts–Martial, United States (1995 ed.), provides that a court member "shall be excused for cause whenever it appears that the member ... [s]hould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." This rule includes challenges based on actual bias as well as implied bias. *United States v. Lavender*, 46 MJ 485, 487 (1997); *United States v. Napoleon*, 46 MJ 279, 283 (1997); *United States v. Minyard*, 46 MJ 229, 231 (1997), citing *United States v. Daulton*, 45 MJ 212, 217 (1996), and *United States v. Harris*, 13 MJ 288, 292 (CMA 1982). RCM 912(f)(3) provides that "[t]he burden of establishing that grounds for a challenge exist is upon the party making the challenge."

 Military judges must follow the "liberal-grant mandate" in ruling on challenges for cause. *United States v. White*, 36 MJ 284, 287 (CMA 1993). "We review [a military judge's] rulings on challenges for cause for abuse of discretion. On questions of actual bias, we give the military judge 'great deference because we recognize that he has observed the demeanor of the participants in the *voir dire* and challenge process.'" *Lavender, supra* at 488, quoting *Napoleon, supra* at 283, quoting *White, supra* at 287.

 We are less deferential on questions of implied bias. Implied bias is reviewed through the eyes of the public. *Lavender,*

*supra* at 488; *Napoleon, supra* at 283, citing *Daulton, supra* at 217. The focus "is on the perception or appearance of fairness of the military justice system." *United States v. Dale*, 42 MJ 384, 386 (1995).

The issue becomes more difficult when the basis of a challenge is founded on unlawful command influence. On the one hand, we recognize that a "member's unequivocal statement of a lack of bias can ... carry weight." *United States v. Mosqueda*, 43 MJ 491, 493 (1996), quoting *United States v. Nigro*, 28 MJ 415, 418 (CMA 1989). We also recognize that the military judge is in the best position to judge the sincerity and truthfulness of the challenged member's responses on *voir dire*. *See Daulton, supra* at 217.

We recognize a commander's responsibility for discipline, the need occasionally for a more senior commander to intervene to prevent a miscarriage of justice, and the reality that an officer's lax attitude toward discipline may reflect inaptitude for command. On the other hand, we have long recognized the problems arising in the administration of military justice because of the "subtle pressures that can be brought to bear by 'command' in military society...." *United States v. Kitts*, 23 MJ 105, 108 (CMA 1986). We also have recognized that sometimes it is difficult for a "subordinate [to ascertain] ... the actual influence a superior has on that subordinate." *United States v. Gerlich*, 45 MJ 309, 313 (1996). Finally, we have recognized that an SJA, though not a commander, generally acts with "the mantle of command authority." *Kitts, supra* at 108.

 In reviewing the issue concerning the challenges for cause, we focus on how the members perceived the briefing by LtCol Rollinger and the remarks of BGen Marr. Neither BGen Marr nor LtCol Rollinger was asked to testify, and thus we have only the fragmentary recollections of those who heard the remarks. The perceived message rather than the actual message is what controls, however, because we are concerned with how the message may have affected the impartiality of the court members.

There is no question about the candor or sincerity of the members' responses during *voir dire.* Their answers disclaimed any bias or partiality, and we do not fault the military judge for finding that the members exhibited no actual bias.

This case, however, involves implied bias. Our concern is with the effect of subtle pressure exerted by the members' perceptions of what they heard. They heard the Commanding General's views of the career potential of a commander who had "underreacted" to a disciplinary situation. Unlike the situation involving intemperate remarks of a ship's captain in *United States v. Newbold,* 45 MJ 109 (1996), the remarks in this case were spoken by the court members' commander and his SJA. Unlike the situation in *United States v. Reynolds,* 40 MJ 198, 202 (CMA 1994), where the SJA intervened after telling his commander that he had "gone too far," the members heard the SJA make the remarks and heard BGen Marr reinforce them. The remarks were recent and fresh in the minds of the court members. The threat was not hypothetical but was specific and reinforced by a recent example.

The military judge commendably recognized the impact of the remarks on LtCol Snyder. In our view, however, the military judge did not fully appreciate that the same sword of Damocles was hanging over the heads of LtCol MacPherson and Maj Taylor.

We recognize that the remarks at issue were directed at the commander's role in initiating disciplinary action rather than an officer's role as a member of a court-martial. Nevertheless, LtCol MacPherson left the staff meeting with the clear impression that a fellow commander's career was in danger of being abruptly ended because BGen Marr considered his response to a disciplinary situation inadequate. Although Maj Taylor adamantly insisted that "my opinion is my opinion," she conceded that her opinion "can be somewhat influenced by guidance and information out there." Under the circumstances, we hold that it was "asking too much" of LtCol MacPherson and Maj Taylor to expect them to impartially adjudge an appropriate sentence without regard for its potential im-

pact on their careers. *See Daulton,* 45 MJ at 218; *Dale,* 42 MJ at 386. Accordingly, we hold that the military judge abused his discretion by denying the challenges.

The decision of the United States Air Force Court of Criminal Appeals is affirmed as to findings but reversed as to sentence. The sentence is set aside. The record of trial is returned to the Judge Advocate General of the Air Force. A rehearing on sentence may be ordered.

Chief Judge COX and Judge EFFRON concur.

SULLIVAN, Judge (concurring in part and dissenting in part):

Our Court granted review of two issues in this case: Issue I, jury bias; and Issue II, command influence. 47 MJ at 339. The majority reverses on Issue I and does not answer Issue II. I would reverse this case on both issues since both issues are interlocked; it is the improper influence of the commander in February 1995 at the commander's meeting right before trial (Issue II) that causes the jury bias of Issue I.

Both the majority and the dissent take a detour through the complicated jungle of "implied bias" as a way around the real issue in this case—the issue of command influence. More to the point, the real question is: Did the February 1995 commander's meeting immediately before the Youngblood trial improperly influence or taint the three already selected Youngblood jurors present at that meeting?

Whether the jurors were tainted by the February commander's meeting is an issue that can be decided by a review of the facts and our case law. The record in this case shows the following relevant dates and events:

1. *December 16, 1994*—Criminal charges against Airman 1st Class Youngblood were referred to a court-martial.

2. *December 16, 1994*—Members of Youngblood's court-martial selected, including Lieutenant Colonels Snyder and MacPherson, and Major Taylor.

3. *Either February 10 or 17, 1995*—Snyder, MacPherson, and Taylor attended a commander's meeting presided over by their commander, a general officer, with his staff judge advocate in attendance. At this meeting, Brigadier General (BGen) Marr communicated to all present his view that justice matters were being handled too leniently by commanders and that he had taken, at least once, actions to "peak" an officer's career because he was too lenient.

4. *February 21, 1995*—Youngblood's court-martial convenes. Snyder is removed for cause due to attendance at the commander's meeting; however, MacPherson's and Taylor's removal for cause is denied.

BGen Marr's remarks to his subordinate commanders at the staff meeting were highly inappropriate. *See United States v. Martinez*, 42 MJ 327, 332 (1995); *United States v. Reynolds*, 40 MJ 198, 201 (CMA 1994). He told these officers that a previous officer under his command had been too lenient in taking disciplinary action and that he was, therefore, sending a letter to that officer's gaining command indicating that he thought that particular officer's career had "peaked." These remarks created the distinct impression upon those officers at the meeting that their careers might also "peak" if BGen Marr thought they were too lenient in their disciplinary actions. Hence, as the majority puts it, the "sword of Damocles was hanging over [these officers'] heads." *See* 47 MJ at 342. Such actions by a commander went far beyond any permissible "training," *see* Art. 37(a)(1), Uniform Code of Military Justice, 10 USC § 837(a)(1), and can be reasonably construed as impermissibly suggesting how these commanders should exercise their judicial discretion. *See United States v. Martinez, supra.*

Today, the majority (with my concurrence) has found that the three court-martial members who attended this meeting were disqualified because of implied bias in this case. RCM 912(f)(1)(N), Manual for Courts–Martial, United States, 1984. It is not contact with command itself that caused these members to be disqualified but the type of contact

which requires that result. *See United States v. Thomas*, 22 MJ 388 (CMA 1986). Eradication of unlawful command influence of this type is one of the main purposes for which this Court was created. *See Reynolds*, 40 MJ at 204 (Sullivan, C.J., dissenting).

Plainly speaking, both sides in a court of law are entitled to a panel of fair jurors, jurors who have not had any pressure put on them to be lenient or to be harsh. The only allowable pressure on a juror is the duty to be fair. Whether a juror succumbs to any improper pressure is really not the main point. A jury system must appear fair for it to be recognized as fair. *United States v. Ayala*, 43 MJ 296, 304 n. 4 (1995) (Sullivan, C.J., concurring in part, dissenting in part, and joining Wiss' dissent).

As Lord Chief Justice Hewart said:

A long line of cases shows that it is not merely of some importance but is of fundamental importance that justice should not only be done, but should manifestly and undoubtedly be seen to be done.[*]

As a final note, I am puzzled by the dissent's attempt to paint BGen Marr's "commander's meeting" comments as a "general instructional or informational course[ ] in military justice" allowable under 10 U.S.C. 837(a)(1). In the first place, the statute's plain wording allows only "general instructional or informational courses in military justice." A general's "commander's call" or "commander's meeting" is certainly not a "course on military justice." In the second place, anyone who has served on active duty and who has attended a "commander's meeting" knows that these meetings are used as a management tool for the commanding officer to get his orders, plans, and operational requirements transmitted to his subordinate commanders. Article 37(a)(1) is clearly not applicable here.

CRAWFORD, Judge (dissenting):

Based on a challenge-for-cause issue, the Court holds that servicemembers who have heard a command briefing concerning discipline and inappropriate decisionmaking a relatively short time before a trial may not sit

---

* *Rex v. Sussex Justices* [1924] 1 K.B. 259.

as court members in that trial. The express reason for the Court's holding is that there was a denial of a challenge for cause based on implied bias. But the Court is casting an issue of command influence as a challenge for cause. I disagree.

## FACTS

The court members at issue, Lieutenant Colonel (LtCol) MacPherson, LtCol Snyder, and Major (Maj) Taylor, who were questioned individually, testified that at a monthly commanders' conference, Brigadier General (BGen) Marr and his staff judge advocate (SJA), LtCol Rollinger, addressed a number of topics, including a child abuse case involving a suspect with a history of past child abuse in which little or no action was taken, and a statutory rape case for which punishment was given pursuant to Article 15, Uniform Code of Military Justice, 10 USC § 815. BGen Marr thought that the officer who acted on the child abuse case had peaked in his career and sent a letter to that effect to the gaining command. The full details of the conference are unclear.

The point BGen Marr was trying to make was put forth by LtCol MacPherson:

[T]he thrust of [BGen Marr's] comments were basically that they expected the commanders to be responsible for maintaining the order and discipline of their unit and that was their job, and that anybody that didn't, he didn't—they were appointed to the position because he expected them to maintain that and that was their charge when he put them in there.

The point was also made by LtCol Snyder:

The general thrust of the briefing was that as commanders we have the responsibility to maintain certain standards; that the standards of the military may be somewhat different than a civilian world.

LtCol Snyder, Maj Taylor, and LtCol Mac-Pherson expressed the opinion that they would be comfortable with imposing a sentence of no punishment.

## DISCUSSION

### Command Influence

This case is another example of the clash that sometimes arises between the need for good order and discipline and the need to maintain an impartial system of military justice. As we have stated:

The primary responsibility for the maintenance of good order and discipline in the services is saddled on commanders, and we know of no good reason why they should not personally participate in improving the administration of military justice. No doubt the personal presentation of that subject by the commander is impressive, but that is as it should be. The question is not his influence but, rather, whether he charted it through forbidden areas.

*United States v. Danzine*, 12 USCMA 350, 352, 30 CMR 350, 352 (1961).

Much more recently, this Court acknowledged that certain aspects of military law, such as questioning of suspects, not only facilitate criminal prosecutions but also provide commanders with essential information.

The primary purpose of military criminal law—to maintain morale, good order, and discipline—has no parallel in civilian criminal law. When a squadron commander ... asks an airman about suspected misconduct, the purpose of the inquiry is not simply to develop a criminal case. An important purpose is to provide that [service-member]'s commander with information about the capability of the individual to perform his or her military mission.

Military missions, whether in combat, in peacetime operations, or in training, are characterized by stress, tension, danger, and the need for rapid decisions based upon accurate information. The habits and traits of character developed in peace can make the difference between success or failure in war.

*United States v. Solis*, 46 MJ 31, 34 (1997).

The Military Justice Act of 1968, Pub.L. No. 90–632, § 2(13), 82 Stat. 1335, amended Article 37, UCMJ, 10 USC § 837, to allow general instructional or informational military justice lectures, including those given solely to members of a command, on substantive and procedural aspects of the military

justice system. 10 USC § 837(a)(1). But Article 37(b) prohibits commanders from considering a court member's performance in evaluating their efficiency.

Under some circumstances, this Court has held that lectures personally given by a commander to the court members did not have an impact on the trial. *Compare United States v. Danzine, supra, with United States v. Littrice*, 3 USCMA 487, 13 CMR 43 (1953). The talk by BGen Marr and his SJA was not directly aimed at the court members, *cf. United States v. Johnson*, 14 USCMA 548, 34 CMR 328 (1964), and it did not direct or suggest a particular result in the present case. *Cf. United States v. Stephens*, 21 MJ 784 (ACMR 1986). In *Johnson*, the Court found that where a pretrial orientation pamphlet directed to court members created "[t]he appearance, or the existence, of command influence," there was a presumption of prejudice. 14 USCMA at 551, 34 CMR at 331. But the Court recognized that, although not done in *Johnson*, this presumption could be rebutted by examining the findings and sentence from the record of trial. *Id.* at 551–52, 34 CMR at 331–32. Likewise, in *United States v. Brice*, 19 MJ 170 (CMA 1985), the Court found prejudice. In the midst of Brice's trial for transfer and sale of lysergic acid diethylamide, all officers, including the court members, were directed to attend a speech by the Commandant of the Marine Corps. During this speech, the Commandant stated that drug trafficking was "intolerable" in the military and that drug traffickers should not be retained. *Id.* at 171. This Court reversed the conviction, concluding that the "confluence of subject and timing, particularly as they affect the minds—however subtly or imperceptibly—of the triers of fact in this particular case," was fatal. *Id.* at 172 n. 3.

In contrast to *Johnson* and *Brice*, this Court did not find prejudice in two recent cases. In *United States v. Reynolds*, 40 MJ 198 (CMA 1994), the commander was a special court-martial convening authority who gave a morning briefing to members of the command that included four members of the panel. At this meeting, he expressed his dissatisfaction with sentences at prior courts-martial. This Court, after examining, *inter alia*, the instructions to the members and the fact that Reynolds did not want to pursue the issue at trial, found beyond a reasonable doubt that Reynolds' sentence was not tainted by these comments. In *United States v. Martinez*, 42 MJ 327 (1995), the court members were "aware" of the wing commander's letter, circulated on the air base 8 days before Martinez' trial for negligent homicide, to the members of his command to get tough on drunk-driving cases. 42 MJ at 331. The wing commander further admonished them not to misperceive how seriously the wing leadership took such matters. *Id.* at 334. This Court held the letter did not have an impact on the court members. *Id.* at 328. Similarly, even if Youngblood's case is limited to the anecdote about the letter BGen Marr sent regarding the officer's career peaking, the impact on the court members in this case is far from obvious.

### Implied Bias

Under the Sixth Amendment, an accused has the right to "an impartial jury." The Supreme Court has held that

> due process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as *voir dire* and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

*Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982). The doctrine of implied bias should be used only in "extreme situations" such as when a "juror is an actual employee of the prosecuting agency, [when] the juror is a close relative of one of the participants in the trial or the criminal transaction, or [when] the juror was

a witness or somehow involved in the criminal transaction." *Id.* at 222, 102 S.Ct. at 948 (O'Connor, J., concurring); *see also United States v. Lavender,* 46 MJ 485, 489 (1997)("appellant·did not carry his burden at trial of showing that his case is the 'rare exception' justifying use of the implied-bias doctrine").

Only a rare circumstance justifies disregarding the members' *voir dire* responses and the military judge's findings. Appellant's case is not such a circumstance. The majority has once again expanded the implied-bias doctrine unnecessarily.

Federal courts in addressing the same issue have indicated that the implied-bias rationale should be a "rare exception." *Hunley v. Godinez,* 975 F.2d 316, 318 (7th Cir. 1992). Admittedly, there are differences between courts-martial with court members and jury trials with civilian jurors. These differences include the purpose of the military justice system, the type of individuals selected to be court members pursuant to Article 25(d)(2), UCMJ, 10 USC § 825(d)(2), and the protection given to general verdicts. *See, e.g., United States v. Hardy,* 46 MJ 67 (1997). Selection of court members "by reason of age, education, training, experience, length of service, and judicial temperament" differs significantly from random selection of civilian jurors by voter-registration or driver's-license lists. Art. 25(d)(2). A military panel of court members has often been called a "blue ribbon" panel due to the quality of its members. *See* Jesse Birnbaum, *A New Breed of Brass: From the Ashes of Vietnam, the Pentagon Has Shaped a Sophisticated Military that Speaks Well and Fights Smart,* 1991 WL 3118757, Time Magazine 58 (March 11, 1991); David Gergen, *Bringing Home the "Storm"; What the Victorious American Military Could Teach the Rest of Us,* 1991 WL 2142956, Washington Post (April 28, 1991). Arguably, this difference is such that invocation of the doctrine of implied bias should be even rarer in the military.

Relying upon this Court's decision in *United States v. Daulton,* 45 MJ 212 (1996), and others, the majority holds there was an implied bias. Under the implied-bias rationale, if a reasonable person in listening to the *voir dire* would have decided that the proceedings were unfair, then this Court, applying a *de novo* review standard, would find error. The Court has not addressed whether these reasonable individuals have to be familiar with the military justice system. *Id.* at 217 ("viewed ... through the eyes of the public").

The standard of review set forth by the majority undercuts the moral authority and .psychological support of the trial bench. The Court fails to realize that there is a collective judgment when certain findings or a sentence are announced. The deliberative process itself is protected. Mil.R.Evid. 606(b), Manual for Courts–Martial, United States (1995 ed.).

The nature of the general verdict was recognized by LtCol Snyder when he said:

> I think the nature of a court-martial and the jury system, and as the judge said, the oath that I swore not to not only talk about it outside the courtroom but with other members at anytime is something that I take seriously and would cause it to be different than any of the other hypotheticals that we discussed. And could not be, you know, attributed directly to me.

Those who would try to penetrate the deliberative process and influence the court members' actions are prohibited from doing so by Article 37.

The court members were instructed that they had the "grave responsibility" of determining a sentence "based upon all the evidence presented and the instructions." They were instructed to consider all the alternative punishments and told they "may not have a preconceived idea or formula as to either the type or the amount of punishment." All members indicated that they could reach a decision on the sentence "on an individual basis in this particular case...." These instructions ensured that the members would not rely upon the statements made by BGen Marr or LtCol Rollinger.

In any event, any error was harmless. *United States v. Bannwarth,* 36 MJ 265 (CMA 1993); *United States v. Heriot,* 21 MJ 11 (CMA 1985). The maximum sentence was

a dishonorable discharge, 29 years' confinement, total forfeitures, and reduction to the lowest enlisted grade. Appellant was charged with numerous drug related offenses but received punishment far less than the maximum: a bad-conduct discharge, 2 years' confinement, partial forfeitures, and reduction to the lowest enlisted grade. For the reasons set out above, I would affirm the decision of the court below.