UNITED STATES of America

v.

Justin H. McMURRIN, Gas Turbine
System Technician Fireman
(E–3), U.S. Navy.

NMCCA 200900475.

U.S. Navy–Marine Corps Court
of Criminal Appeals.

Sentence Adjudged 17 June 2009.

Decided 21 Sept. 2010.

For Appellant: Capt Michael Berry,
USMC.

For Appellee: Col Louis J. Puleo, USMC;
LCDR Sergio Sarkany, JAGC, USN.

PRICE, J., delivered the opinion of the
court in which MITCHELL, S.J., MAKSYM,
S.J., CARBERRY, S.J., PERLAK, J., and
BEAL, J., concur. BOOKER, S.J., filed an
opinion concurring in the result.
REISMEIER, C.J., and PAYTON-
O'BRIEN, J., did not participate in the
decision of this case.

## PUBLISHED OPINION OF THE COURT

PRICE, Judge:

The appellant entered mixed pleas to of-
fenses related to the death of another Sailor.
A military judge sitting alone as a general
court-martial convicted the appellant of con-
spiracy to possess cocaine, violating an order,
use of cocaine, obstruction of justice, and
negligent homicide, violations, respectively,
of Articles 81, 92, 112a, and 134, Uniform
Code of Military Justice, 10 U.S.C. §§ 881,
892, 912a, and 934.[1] The convening authority

---

1. Specifically, the appellant pleaded guilty to,
and was found guilty of, conspiracy to possess
cocaine, use of cocaine, and making two false
statements that impeded an investigation by civil
authorities, violations, respectively, of Articles
81, 112a, and 134, UCMJ. He pleaded not guilty
to, and was found guilty of, violating an order

and impeding the civil authorities' investigation
by hiding the deceased's cell phone, violations,
respectively, of Articles 92 and 134, UCMJ, and
he pleaded not guilty to, and was found not
guilty of, manslaughter in violation of Article
119, UCMJ, but he was found guilty of the lesser

approved the adjudged sentence of confinement for 66 months, forfeiture of all pay and allowances, reduction to pay grade E–1, and a dishonorable discharge from the United States Navy.

The appellant raises three assignments of error asserting that: (1) the finding of guilty for negligent homicide is legally and factually insufficient where the appellant's acts or omissions did not amount to simple negligence; (2) even if his acts or omissions amounted to simple negligence, that negligence was not the proximate cause of Machinist's Mate Fireman Recruit (MMFR) [S]'s death, and (3) that his conviction for negligent homicide as a lesser included offense of involuntary manslaughter violates the requirements of due process and Article 79, UCMJ, 10 U.S.C. § 879. This court specified two additional issues regarding variance between the alleged offense of violation of a lawful order, the military judge's finding of guilty, and subsequently issued special findings that reflect findings of guilty for violation of a lawful general order.

Based on our review of the appellant's third assigned error and the issues specified by this court, we set aside the guilty findings of negligent homicide and violating an order,[2] dismiss Charges II and IV and the specifications thereunder, affirm the remaining findings of guilty, set aside the sentence, and authorize a rehearing as to the sentence.

## Background

This case can rightly be described as tragic. The appellant and MMFR [S] were friends and schoolmates at an apprenticeship course at Naval Station Great Lakes, Illinois. The two shipmates went out on liberty in the local area on 19 July 2008, and less than 24 hours later MMFR [S] was dead of cocaine and heroin intoxication.

The appellant and MMFR [S], his then liberty buddy,[3] left the Naval Station and headed toward a local mall. On the way, they met "Shorty," a person who had con-

tacts with drug suppliers. Shorty provided them a quantity of cocaine, which the Sailors ingested. A short while later, they again contacted Shorty, who procured more cocaine and also, at MMFR [S]'s request, some heroin. After ingesting additional cocaine and the heroin, MMFR [S] immediately began to mumble incoherently and to nod off to sleep.

Though immediately concerned for MMFR [S]'s welfare, the appellant did not seek emergency medical assistance due to his concern that both Sailors drug use would be discovered. Instead, he asked Shorty to drive him and MMFR [S] to a hotel where other junior Sailors had gathered. Once at the hotel, the appellant and Shorty carried the incoherent MMFR [S] from the car and placed him in the grass near the parking lot.

The appellant then entered the hotel where the other Sailors were socializing, "had a beer or two," and later returned to check on MMFR [S]. Though still breathing, MMFR [S] was unresponsive to the appellant's efforts to rouse him through talking and slapping. Realizing MMFR [S] was "kind of in the open," the appellant "pulled [him] behind a larger bush or some brush," and returned to the party.

The appellant checked on MMFR [S] at least one more time before concluding that he was dead. The then panicked appellant returned to the party and later discarded MMFR [S]'s cell phone, military identification card, and debit card.

Several hours later, a passerby noticed MMFR [S]'s body in the grass and summoned emergency authorities. The medical examiner fixed the cause of death as heroin and cocaine intoxication. After MMFR [S]'s body was discovered, local police began an investigation, and the appellant's actions during the course of the investigation led to the obstruction charges against him.

included offense of negligent homicide in violation of Article 134, UCMJ.

**2.** Given our resolution of the appellant's third assigned error, we do not reach the appellant's first and second assigned errors.

**3.** Specific obligations will be discussed elsewhere in the opinion, but essentially many Naval commands require that persons of particular or all pay grades pair up during off-duty hours if they are leaving the installation or ship.

## I. Negligent Homicide as a Lesser Included Offense of Involuntary Manslaughter

The appellant asserts that negligent homicide does not satisfy the statutory elements test for lesser included offenses [hereinafter LIOs] as it includes a statutory element not present in the charged offense of involuntary manslaughter, and that he was not otherwise provided notice of the need to defend against that charge as required by the Due Process Clause of the Constitution.

The Government concedes that as a result of the United States Court of Appeals for the Armed Forces (CAAF) recent decision in *United States v. Jones,*[4] and under the facts of this case, negligent homicide no longer satisfies the Constitutional or statutory requirements for an LIO of involuntary manslaughter. However, the Government argues that the appellant was availed of his Constitutional right to notice to be prepared to defend against the charge of negligent homicide and requests that we affirm the findings of guilty.

### A. Principles of Law

■ "The Constitution requires that an accused be on notice as to the offense that must be defended against, and that only lesser included offenses that meet these notice requirements may be affirmed by an appellate court." *United States v. Miller,* 67 M.J. 385, 388 (C.A.A.F.2009)(citing *Jackson v. Virginia,* 443 U.S. 307, 314, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979))(additional citations omitted). Consonant with these Constitutional principles, the Uniform Code of Military Justice provides that an accused "may be found guilty of an offense necessarily included in the offense charged[.]" Article 79, UCMJ; *see also Miller,* 67 M.J. at 388. Where comparison of the elements of two distinct offenses reveals that one of those offenses is not a necessarily included offense of the other, "the requirement of notice to an accused may be met if the charge sheet 'make[s] the accused aware of any alternative theory of guilt.'" *Miller,* 67 M.J. at 389, n. 6 (quoting *United States v. Medina,* 66 M.J. 21, 27 (C.A.A.F.2009)).

### B. Questions Presented

The questions presented in this appeal are: (1) whether, following the CAAF decisions in *Miller* and *Jones,* negligent homicide constitutes, under Article 79, UCMJ, an LIO of involuntary manslaughter, and (2) if not, whether the appellant was otherwise availed of his Constitutional right of notice to be prepared to defend against the charge of negligent homicide. We review these questions of law *de novo. Id.* at 387.

### C. Discussion

#### (1) Post-*Jones* is negligent homicide an LIO of involuntary manslaughter?

■ The appellant and the Government agree that, post-*Jones,* negligent homicide no longer qualifies as an LIO of the charged offense of involuntary manslaughter. *See* Arts. 119 and 134, UCMJ. We agree.

This conclusion, though undisputed by the parties, constitutes a significant change to military jurisprudence. At the time of the appellant's conviction, negligent homicide had been recognized as an LIO of involuntary manslaughter in the military since before enactment of the Uniform Code of Military Justice in 1951. *See generally United States v. Kirchner,* 4 C.M.R. 69, 71, 1952 WL 2689 (C.M.A.1952); *United States v. Romero,* 1 M.J. 227, 228 n. 1 (C.M.A.1975); *United States v. Kick,* 7 M.J. 82, 85 (C.M.A.1979); *United States v. Harrow,* 65 M.J. 190, 202 (C.A.A.F.2007) *United States v. Romero,* 1 M.J. 227, 229 (C.M.A.1975) *United States v. Romero,* 1 M.J. 227, 229 (C.M.A.1975) *United States v. Romero,* 1 M.J. 227, 229 (C.M.A. 1975).

However, *Miller* and *Jones* dramatically changed the landscape of whether violations of Article 134 may qualify as LIOs of offenses enumerated in the Uniform Code of Military Justice.

First, in *Miller,* the CAAF addressed the question "whether a simple disorder under Article 134, UCMJ, was a lesser included offense of the violation of Article 95,

---

4. 68 M.J. 465 (C.A.A.F.2010)

UCMJ[.]" *Miller*, 67 M.J. at 387 (footnotes omitted). Before setting aside and dismissing the simple disorder, the CAAF overruled their previous decisions "[t]o the extent those cases support the proposition that clauses 1 and 2 of Article 134, UCMJ, are *per se* included in every enumerated offense[.]" *Miller*, 67 M.J. at 389 (overruling in part *United States v. Foster*, 40 M.J. 140 (C.M.A. 1994)).

This *per se* or implied presence of the so-called terminal element long provided the legal predicate for the conclusion that charging a violation of an enumerated article "provide[d] sufficient notice of the element of prejudice to good order and discipline or service discrediting conduct," thus rendering conduct proscribed under Article 134 a potential LIO of the enumerated offenses. *Id.* at 388. Accordingly, one impact of *Miller* was to bring into question the continued validity of Article 134 clause 1 or 2 offenses, as LIOs of offenses enumerated in Articles 81 through 132, UCMJ.

Then, in *Jones*, the CAAF addressed, "whether an offense is 'necessarily included' in, a subset of, or an LIO of a charged 'greater' offense when it has no elements in common with the elements of the charged offense but is nonetheless either listed as an LIO in the *MCM* or has been held by this Court to be an LIO on some other ground." *Jones*, 68 M.J. at 466 (citation omitted). The court answered this question in the negative.

The *Jones* opinion addresses three distinct issues: (1) the method for determining what constitutes an LIO under Article 79, UCMJ, (2) the role of the President in defining LIOs of offenses specifically enumerated in the UCMJ, and (3) the continued validity of prior holdings of the CAAF regarding Article 134 clause 1 or 2 offenses, as LIOs of those enumerated offenses.

In *Jones*, the CAAF returned to the elements test as the primary, if not sole, method for determining what constitutes an LIO under Article 79, UCMJ. Specifically, the court discussed adoption of the elements test for determining LIOs under Article 79 after the Supreme Court's decision in *Schmuck v. United States*, 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). *Jones*, 68 M.J. at

470 (citing *United States v. Teters*, 37 M.J. 370, 375–76 (C.A.A.F.1993)). After discussing post-*Teters* deviations from that test, the court overruled all intervening decisions "[t]o the extent [they] deviated from the elements test[.]" *Id.* at 472.

The CAAF also concluded that the President's identification of LIOs in the Manual for Courts–Martial is not binding on the court, particularly where the President declares "that a particular example of an Article 134, UCMJ, offense is a lesser included offense of something Congress defined as a criminal offense in a separate section of the UCMJ, and which is defined by elements that have no common ground with Article 134 UCMJ." *Id.* at 472.

Finally, and as previously discussed, the court overruled all intervening decisions "[t]o the extent [they] deviated from the elements test[.]" *Id.* at 472 (citations omitted).

Although we share many of our dissenting brother's concerns regarding the broad impact of *Jones vis-à-vis* the doctrine of *stare decisis*, and agree that that impact is largely attributable to *dicta*, the impact of *Jones* is very broad indeed. In his dissent, Judge Baker described this impact: "[a]s a result, because the statutory elements of clauses 1 and 2 of Article 134, UCMJ ... do not and cannot line up with any of the enumerated offenses, the majority's decision means that offenses charged under clauses 1 and 2 of Article 134, UCMJ, can never be lesser included offenses to any other punitive article in the UCMJ, or with respect to clause 3 of Article 134, UCMJ." *Id.* at 474 (Baker, J. dissenting).

Here we need only address *Jones'* impact on the appellant's conviction of negligent homicide as an LIO of the charged offense of involuntary manslaughter.

First, *Jones* declares a "new rule" applicable to cases on direct appeal, and thus is applicable here. *See United States v. Harcrow*, 66 M.J. 154, 159 (C.A.A.F.2008)(quoting *Johnson v. United States*, 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997))("where the law at the time of trial was settled and clearly contrary to the law at the time of appeal—it is enough that an error

be plain at the time of appellate consideration").

Second, two of the CAAF's decisions subsequent to *Jones* inform our analysis. In a summary disposition, the court noted that "in light of [*Jones*] we hold that indecent assault under Article 134 ... is not a lesser included offense of rape under Article 120, UCMJ[.]" *United States v. Burleson*, 69 M.J. 165 (C.A.A.F.2010). *Compare United States v. Headspeth*, 10 C.M.R. 133, 135, 1953 WL 1790 (C.M.A.1953)("indecent assault is a lesser included offense of rape"); *United States v. Brown*, 65 M.J. 356, 360 (C.A.A.F.2007)(indecent assault conviction as LIO of rape affirmed). And in *United States v. Yammine*, 69 M.J. 70 (C.A.A.F.2010), the CAAF noted that "under [*Jones*] indecent acts with a child under Article 134, UCMJ, is not a lesser included offense of sodomy under Article 125, UCMJ." *Id.* at 79 n. 7.

We therefore conclude that post-*Jones*, the question of whether negligent homicide constitutes an LIO of involuntary manslaughter "must be determined with reference to the elements defined by Congress, for the greater offense." *Jones*, 68 M.J. at 471. We will apply the CAAF's definition of the statutory elements test from *Jones* in answering this question.

> Under the elements test, one compares the elements of each offense. If all of the elements of offense X are also elements of offense Y, then X is an LIO of Y. Offense Y is called the greater offense because it contains all of the elements of offense X along with one or more additional elements.

*Id.* at 470.

Congress defined involuntary manslaughter by culpable negligence as: "Any person subject to [the UCMJ] who, without an intent to kill or inflict great bodily harm, unlawfully kills a human being—by culpable negligence[.]" Article 119(b), UCMJ, 10 U.S.C. § 919.[5]

Congress defined clauses 1 and 2 of Article 134 as: "all disorders and neglects to the prejudice of good order and discipline in the armed forces, all conduct of a nature to bring discredit upon the armed forces." [6]

Comparison of either the statutory elements or the Presidentially described elements, reveals that involuntary manslaughter does not include, as an explicit element, either terminal element of Article 134 clauses 1 or 2 (e.g., that the conduct was to the prejudice of good order and discipline in the armed forces, or of a nature to bring discredit upon the armed forces). Therefore unless the terminal element is otherwise present, negligent homicide cannot satisfy the statutory elements test as "all of the elements of [negligent homicide] are [not] also elements of [involuntary manslaughter]." *Jones*, 68 M.J. at 470.

As previously discussed, in *Miller* the CAAF rejected the implicit presence premise of clauses 1 and 2 of Article 134, UCMJ, in offenses enumerated under the Code. In *Jones* the CAAF concluded the President's listing of LIOs, though potentially persuasive, is of no import when the prospective LIO does not first satisfy the statutory elements test. By overruling all post-*Teters* decisions that deviate from the statutory elements test, the court made clear that the statutory elements test is the primary, if not sole, basis for determining whether an offense qualifies as an LIO of another offense under Article 79, UCMJ.

Application of *Miller* and *Jones* to the facts present here leads to only one conclu-

---

**5.** The Manual for Courts-Martial, United States (2008 ed.), Part IV, ¶ 44b(2), defines the elements of involuntary manslaughter by culpable negligence as: (1) That a certain person is dead; (2) That the death resulted from the act or failure to act of the accused; (3) That the killing by the accused was unlawful; and (4) That the act or failure to act of the accused which caused the death amounted to more than simple negligence.

**6.** The MCM defines the elements of negligent homicide charged under clause 1 or 2 of Article

134 as: (1) That a certain person is dead; (2) That the death resulted from the act or failure to act of the accused; (3) That the killing by the accused was unlawful; (4) That the act or failure to act of the accused which caused the death amounted to simple negligence; and (5) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces. MCM, Part IV, ¶ 85b.

sion, negligent homicide does not satisfy the statutory elements test as an LIO of the charged offense of involuntary manslaughter.

## (2) Was the appellant otherwise availed of his Constitutional right of notice to be prepared to defend against the charge of negligent homicide?

■ The appellant asserts that *Jones* is dispositive, that he was not otherwise placed on notice of the requirement to defend against the charge of negligent homicide by the specification of the charge, and that he suffered prejudice by being convicted of an offense that was neither charged nor an LIO of the charged offense.

The Government answers in the affirmative and contends that the appellant does not establish the prejudice required to establish plain error or to prevail on a fatal variance claim.

We will first assess whether the charge satisfies the notice requirement by "mak[ing] the accused aware of any alternative theory of guilt." *Miller*, 67 M.J. at 389 n. 6 (quoting *Medina*, 66 M.J. at 27)(internal quotation marks omitted).

The specification of the charge alleges that the appellant "did ... by culpable negligence unlawfully kill [MMFR [S]] by failing to request medical assistance ... and concealing [MMFR [S]'s location], whose death was a reasonably foreseeable consequence [of those acts]." Charge Sheet.

Clearly the specification does not allege the elements of prejudice to good order or service discrediting conduct such that it would have put the appellant on notice of negligent homicide as an LIO. Therefore, we conclude that the specification of the charge, standing alone, does not satisfy the Constitutional notice requirement.

This, however, does not end our inquiry, as the Government invokes both actual and constructive notice arguments. The Government asserts this case is distinguishable from *Jones* as the appellant was tried on a theory that included negligent homicide as an LIO of the charged offense, and where negligent homicide was discussed prior to completion of the Government's case in chief.

The Government argues that *Jones* describes a case "where conviction of an offense not charged would not be prejudicial." Appellee's Supplemental Brief of 15 Jul 2010 at 8. This bold assertion is attributed to a footnoted comment in *Jones*, that under the third prong of plain error analysis, conviction of an offense not charged is clearly prejudicial where "the case was not tried on a theory of indecent acts and the military judge did not introduce the subject of indecent acts into the case until after the parties had completed their presentation of the evidence." *Jones*, 68 M.J. at 473 n. 11.

Here, without further citation to authority, the Government attempts to distinguish this case from *Jones*, and argues that the cited footnote supports a conclusion that the absence of surprise renders an otherwise invalid conviction valid. We disagree.

Though the record reflects that the trial defense counsel, trial counsel and military judge believed, based upon the state of the law pre-*Jones*, that negligent homicide was recognized as an LIO of involuntary manslaughter, the record is silent as to the appellant's awareness of this matter of law. More importantly, the Government's actual notice argument is contrary to both the clear import of *Jones* and fundamental due process principles.

One recent CAAF decision suggests that under very narrow circumstances, constructive notice may remain viable post-*Jones*. In *United States v. Conliffe*, 67 M.J. 127 (C.A.A.F.2009), after finding "fair constructive notice" the CAAF affirmed findings of unlawful entry in violation of Article 134, UCMJ, as an LIO of housebreaking, in violation of Article 130, UCMJ. *Id.* at 134–35. However, *Conliffe*, was both narrowly decided and predates *Miller* and *Jones*.

First, *Conliffe*, was a guilty plea case, where the military judge explicitly informed the appellant that unlawful entry was an LIO of housebreaking. Second, Conliffe, admitted during the providence inquiry that as an Army "cadet," his intended conduct brought discredit upon himself and the Army as an officer and gentleman. The CAAF affirmed the Article 134 LIO citing the "fair construc-

tive notice" and that "in military law conduct unbecoming an officer and a gentleman necessarily encompasses service discrediting conduct." *Id.* at 134.

We find *Jones* dispositive, and conclude in this contested case, the charge provided the appellant neither actual nor constructive notice to defend against the charge of negligent homicide.

## D. Conclusion

Notwithstanding more than 60 years of precedent, we conclude that the CAAF's decisions in *Miller* and *Jones* constitute binding precedent and are dispositive here. Post-*Jones*, the statutory elements test is the primary, if not sole, test for determining what constitutes an LIO under Article 79, UCMJ. As negligent homicide includes at least one element not explicitly included in the offense of involuntary manslaughter, it is not an LIO of involuntary manslaughter. In addition, the specification alleged did not otherwise provide the appellant notice that he must defend against the offense of negligent homicide. Accordingly, we conclude the approved findings of guilty to negligent homicide must be set aside.

## II. Article 92 Violation

On appeal, the parties agree that the military judge's special findings reflect that he entered guilty findings for violation of a lawful general order, an offense not before the court. The Government also concedes that the military judge's failure to enter findings on the proper charge amounts to a finding of not guilty.

The specification of the charge clearly alleges a violation of a lawful order, the elements of which are: (a) issuance of the order; (b) knowledge of the contents of the order; (c) duty to obey the order; and (d) failure to obey the order. MCM, Part IV, ¶ 16b(2).

During pretrial motions, however, *see* Record at 76–93, the parties began a journey down the road of violation of a lawful general order, the elements of which are: (a) existence of a general order; (b) duty to obey the order; and (c) failure to obey the order. MCM, Part IV, ¶ 16b(1). While the Government produced evidence at trial that is legally sufficient to support a guilty finding for violation of a lawful order, the military judge's special findings reflect findings of guilty to violation of a lawful general order. The military judge in his special findings also omits a critical element, knowledge of the order, needed to find the appellant guilty of the offense alleged.[7] Appellate Exhibit XXXI, ¶ 1 (listing as the proven elements the existence of the order as a lawful general regulation, the duty to obey it, and the failure to obey it).

Because the appellant was found guilty of an offense that he did not commit and with which he was not charged, that finding must be set aside. *Cf. United States v. Jones,* 2009 WL 1508418, 2009 CCA LEXIS 134, (A.F.Ct.Crim.App. 29 Apr. 2009)(special findings under R.C.M. 918(b) are akin to special findings under FED.R.CRIM.P. 23(c) and on an ultimate issue of guilt or innocence are subject to the same appellate review as a general finding of guilt); *United States v. Dilday,* 47 C.M.R. 172, 174, 1973 WL 14692 (A.C.M.R.1973).

## III. Conclusion

We set aside the guilty findings of negligent homicide and violating an order, dismiss Charges II and IV and the specifications thereunder. We affirm the remaining findings of guilty.

Our action in setting aside two guilty findings in this case constitutes a "significant change in the penalty landscape," a change so significant that we are unable to reassess the sentence. *See United States v. Buber,* 62 M.J. 476, 479 (C.A.A.F.2006) (citations omitted). We therefore set aside the approved sentence and order the record returned to an appropriate convening authority who may order a rehearing on sentence only. After the proceedings are completed, the record of trial will be returned to this court for further

---

7. We also observe that the record includes no evidence from which we can conclude that the order involved was a "general" order, that is, one issued by a flag or general officer in command or an officer exercising general court-martial jurisdiction, or by a military or civilian superior (e.g., Service secretary) to such officers. MCM, Part IV, ¶ 16c(1)(a).

review consistent with *Boudreaux v. United States Navy–Marine Corps Court of Military Review,* 28 M.J. 181 (C.M.A.1989).

Senior Judges MITCHELL, MAKSYM, and CARBERRY, and Judges PERLAK and BEAL concur.

BOOKER, Senior Judge (concurring in the result):

I agree with the court that the appellant's conviction for negligent homicide must be set aside and that charge dismissed, but I cannot join the court on its journey to that conclusion. I agree with the court's treatment of the conspiracy, order, drug use, and obstruction offenses, and I agree with the court's decision to set aside the sentence and authorize a sentence rehearing.

I agree with the majority's proposition that a Court of Criminal Appeals is not free to disregard precedent established by the Court of Appeals for the Armed Forces. I also believe, however, that a Court of Criminal Appeals is privileged, if not obliged, to distinguish contrary authority especially where that authority is constructed on unsettled legal ground, and that is why I would conclude that negligent homicide was available as an included offense of the charged offense of involuntary manslaughter. Having determined that the offense of negligent homicide was fairly and properly before the court-martial, I would then go on to answer the appellant's assignment of error regarding the factual sufficiency of the evidence. I cannot find that the facts presented to the military judge were sufficient for him to conclude that the appellant was guilty of negligent homicide, and I therefore would set aside the guilty finding for negligent homicide and set aside the sentence.

### Included Offenses, Notice, and *Stare Decisis*

I write first to voice my concerns about the potentially overbroad application of *United States v. Jones,* 68 M.J. 465 (C.A.A.F.2010), and *United States v. Miller,* 67 M.J. 385 (C.A.A.F.2009). Even though the parties in our case appear to agree that those cases, especially *Jones,* dictate the outcome here, I would limit those cases to the facts on which

they were decided. So limited, those cases have very narrow application.

In *Miller,* the Court of Appeals was faced with a prosecution under Article 95, Uniform Code of Military Justice, 10 U.S.C. § 895. When the Army Court of Criminal Appeals found that a critical element of the offense—an attempt to apprehend—had not been established at the trial level, that court instead affirmed a finding of guilty of a "simple disorder," invoking its authority under Article 79, UCMJ, to do so.

On appeal, the Court of Appeals determined that Miller had not been put on notice that his behavior might constitute a simple disorder. 67 M.J. at 385. I do not quibble with that determination. *See also* MANUAL FOR COURTS-MARTIAL, UNITED STATES (2005 ed.), Part IV, ¶ 60c(5)(a)(preemption provisions). The Court of Appeals went beyond a simple resolution of the case, however, and declared that previous cases that could be interpreted to mean that service discredit and prejudice to good order and discipline existed in every enumerated offense (essentially, Articles 81 through 132) of the Code had gone too far and were thus overruled. *Miller,* 67 M.J. at 389 (proposition that clauses 1 and 2 of Article 134 are *per se* included overruled). The Court of Appeals reached this conclusion, incidentally, less than 6 months after it had reached a conclusion which, if not a polar opposite, was at least substantially to the contrary. *See United States v. Conliffe,* 67 M.J. 127 (C.A.A.F.2009)(holding that unlawful entry, in violation of Article 134, was an offense necessarily included within the ambit of housebreaking in violation of Article 130, UCMJ).

In *Jones* the Court of Appeals determined that indecent acts with another, at the time a violation of Article 134, was not a necessarily included offense of rape, a violation of Article 120, UCMJ. As the Court of Appeals framed the issue, it was "whether an offense is 'necessarily included' in, a subset of, or an LIO of a charged 'greater' offense when it has no elements in common with the elements of the charged offense but is nonetheless either listed as an LIO in the *MCM* or has been held by this Court to be an LIO on

some other ground." *Jones,* 68 M.J. at 467. The Court of Appeals later expanded upon this concern in noting the limitation of its holding: the ability of the President to declare that a particular example of an Article 134, UCMJ, offense is a lesser included offense of something Congress defined as a criminal offense in a separate section of the UCMJ, and which is defined by elements that have no common ground with Article 134, UCMJ. *Id.* at 471.

From a strict notice perspective, the court's decision makes perfect sense given the facts of *Jones:* no penetration is necessary to commit an indecent act, no force or lack of consent need be shown. Conversely, sexual intercourse is not inherently "indecent"—repugnant to common propriety, likely to corrupt morals with regard to sexual relations—although in the context of rape it certainly appears to be. Had the Court of Appeals ended with a resolution of the question it said was presented, I would have no trouble with the course that it charted. The Court of Appeals did violence to the language of Article 79, however, and the notion of *stare decisis*—which affords a critical predictability to actions under not only the Code, which applies in all places and all times, but under any system of laws—when it issued its sweeping declaration that any cases that deviated from what it believes was the elements test were overruled.

Sadly, the Court of Appeals mixed distinct legal principles in *dicta* in the *Jones* decision. Although *Jones* purported to examine the notice afforded the airman regarding his conviction for an indecent act, the Court of Appeals further confused matters by discussing a line of cases—*United States v. Teters,* 37 M.J. 370 (C.M.A.1993), and its sequelae—that interpret and apply the Double Jeopardy clause of the fifth amendment, not the Due Process clause. *Jones,* 68 M.J. at 470–71. Turning to the case at bar, I have no doubt that the appellant could not now be prosecuted for any form of unlawful killing greater than negligent homicide, as a finder of fact has already concluded that only simple negligence, not culpable negligence or a higher degree of criminal liability, was involved in the death of the other Sailor.

The Court of Appeals was trying in *Miller* and *Jones* to build on a foundation it believed it had established in *United States v. Medina,* 66 M.J. 21 (C.A.A.F.2008), a case involving child pornography. The appellant in *Medina* was convicted of a "crime and offense not capital," a clause 3 violation, but the Army Court of Criminal Appeals determined that, because some of Medina's offenses occurred abroad, it was necessary to affirm a finding to a "lesser" clause 1 or clause 2 offense. 66 M.J. at 24. The Court of Appeals reversed the judgment of the Army Court, holding that because Medina had not been informed through the charging document that he was facing prosecution for a prejudicial or service-discrediting series of actions, his conviction on the "alternative theory" violated due process. *Id.* at 28.

The Court of Appeals was correct in its conclusion, but it created confusion when it lumped all three clauses of Article 134 together in its reasoning as cut from the same cloth. *Id.* at 26 (viewing as alternative theories of prosecution is consistent with precedent). In fact, as the Court of Appeals later noted, a clause 3 prosecution will never fairly embrace the elements of clause 1 or clause 2, as clause 3 is merely a vehicle for bringing before a court-martial a violation of substantive state or federal criminal law. No state or federal offense has as an element the effect on the reputation of the service or the effect on military efficiency. *Id.* In a case such as that, a clause 1 or clause 2 allegation is in fact an "alternative theory of guilt." *Id.* at 27. I would also agree in such an instance that it requires notice and proof of additional elements. I also suspect that maximum punishments are likely affected by the charging method: an attempted violation of section 2422 of title 18, for example, if charged under clause 3 would carry the statutory maximum of life imprisonment, whereas if one were to charge the same conduct as a clause 1 or 2 violation and then reach a guilty finding of an attempted violation of clause 1 or 2, the maximum confinement would be the 20 years under Article 80.

In *Medina,* the Court of Appeals was truer to the holdings of *Schmuck v. United States,* 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734

(1989) and *Dunn v. United States*, 442 U.S. 100, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979), than it has been in subsequent decisions. In *Schmuck*, the Court rejected the "inherent relationship" test and instead adopted its "elements" test when it reviewed a failure to instruct, under the Federal Rules of Criminal Procedure, on a lesser included offense appearing in a completely different title of the United States Code, the greater offense being a mail fraud in violation of title 18, the assumed lesser a consumer protection violation founded in title 15. As the Court noted in its opinion, the "elements approach involves a textual comparison of criminal statutes and does not depend on inferences that may be drawn from evidence introduced at trial." 489 U.S. at 720, 109 S.Ct. 1443. It contrasted that simplicity with the "inherent relationship" approach, which requires a determination that the offenses protect the same interests and that "in general" proof of the lesser "necessarily" involves proof of the greater. *Id.* at 721, 109 S.Ct. 1443. Particularly in *Schmuck*, facts necessary to prove one offense had no relevance to the other. *Id.* at 722, 109 S.Ct. 1443.

*Dunn* was a case involving variance between allegation and proof, and is often cited by the Court of Appeals for the proposition that it is as much a due process violation to be imprisoned following conviction on a charge on which one was never tried as it is to be convicted on a charge that was never made. *E.g., United States v. Riley*, 50 M.J. 410, 415 (C.A.A.F.1999). *Dunn* involved a defendant who had been charged with making a false statement in connection with grand jury proceedings. The Government's proof included the statement (a sworn affidavit provided to the grand jury target's attorney) alleged in the indictment, and during its case in rebuttal it introduced a second statement (a court appearance subsequent to the affidavit, in which the defendant adopted the contents of the affidavit) allegedly false in material particulars. While Dunn was convicted of false statement related to the charged statement, the United States Court of Appeals for the Tenth Circuit affirmed a violation based only on the contents of the rebuttal statement, holding as a matter of law that the affidavit to the target's attorney

was not an "ancillary proceeding" to the grand jury and thus not covered by the specific statute. 442 U.S. at 106, 99 S.Ct. 2190. The Supreme Court reversed the judgment of the Tenth Circuit, reasoning that the defendant was deprived of fair notice that he would be defending, substantively, against the statement made in the later, actual, ancillary proceeding. *Id.* at 107, 99 S.Ct. 2190.

Contrast *Miller, Jones, Medina, Schmuck*, and *Dunn* with an alleged violation of an enumerated article: the service member is aware that, as a service member, he is held to a standard of conduct that must promote, or at least must not detract from, military discipline and efficiency, and he is aware that his calling in the profession of arms sets him apart from civil society. *See Parker v. Levy*, 417 U.S. 733, 743, 751, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). *Cf.* Art. 5, UCMJ, 10 U.S.C. § 805 ("This chapter applies in all places"). Indeed, the member's "privileged status" as a combatant under the law of armed conflict depends on this notion of discipline and efficiency. I read Supreme Court precedent and the Code to supply the needed notice with respect to the General Article.

In the case before us, the appellant was charged with the involuntary manslaughter of his classmate because of his failure to obtain necessary medical care and because of his effort to secrete the doomed Sailor's body. The elements of the offense with which he was charged and the offense of which he was convicted overlap to a great extent. To distinguish the language of *Jones,* the elements of involuntary manslaughter and negligent homicide have substantial common ground and many elements in common—a dead person; an act or an omission by the accused; unlawfulness of the killing; and both include a breach of a duty of care. I conclude that the concerns of the fifth amendment are here met: the appellant was placed on notice, through the specification, of the substantive and theoretical bases for his prosecution, and he is protected against successive prosecutions for the same act.

One important distinction between involuntary manslaughter and negligent homicide is that conviction of the former requires proof of culpable negligence, while conviction of the latter requires proof of simple negligence. The culpable negligence ordinarily cannot be proven in civilian prosecutions absent some sort of "special relationship" between the alleged perpetrator and the alleged victim—e.g., parent and child; doctor and patient; driver and passenger. What is more, the duty in civilian society is violated *only* by culpable negligence, not simple negligence. A mere passerby is under no duty to alert the authorities if he sees a stranger in distress; no witness to the death of Kitty Genovese was indicted for failing to render aid or call the police. Going beyond the hypothetical to the actual, and consistent with the decades of precedent cited in the lead opinion here, it is only because the appellant, having entered a specialized society that places emphasis on military efficiency and caring for shipmates, is believed to have failed by simple negligence in that duty that he faced criminal exposure.

Carried to a logical stopping point, not even an extreme one, the Court of Appeals' decisions in *Jones* and *Miller* will produce many unpalatable, most likely unintended, outcomes. Charge sheets will grow in length and complexity, as charging authorities seek to "cover all the bases" when alleging violations. Confusion will abound as to elements and maximum punishments (as, for example, would be the case in charging attempted enticement of a minor to engage in criminal sexual activity under Article 80 as opposed to under Article 134, clause 3). Claims of unreasonable multiplication of charges will increase geometrically, making for complicated instructions to the members, potentially inconsistent findings, and headaches for reviewing authorities and appellate courts. Persons convicted under "alternative theories of prosecution" for a single offense of sexual misconduct may face more onerous registration and monitoring requirements due to the number of convictions, notwithstanding they are merged for punishment. The character trait of "good military character," formerly deemed relevant to contest almost every charge under the Code, will now be limited, on the basis of relevance, to those offenses where the trait is truly implicated—it will not be available to defend against battery, but it might be available to defend against battery on a commissioned, warrant, noncommissioned, or petty officer. Service members risk losing their "privileged combatant" status if their commanders lose the ability to maintain good order and discipline. *Cf. Jones,* 68 M.J. at 475 (Baker, J., dissenting).

In sum, I worry about the potentially overbroad reach of *Jones* and *Miller.* Those two cases could wipe away decades of precedent—of particular concern in this case, the precedent noted in the majority opinion regarding the relation between involuntary manslaughter and negligent homicide; could do serious violence to the concept of *stare decisis*—particularly the predictability that such a doctrine affords; and could turn an "eminently straightforward" approach to military justice into a Gordian knot of confusion.

### Factual Sufficiency of the Evidence

Because I have concluded that negligent homicide is necessarily included in involuntary manslaughter, I would move to consider the factual sufficiency of the evidence. When our court considers an appeal of a court-martial conviction and sentence, we may only affirm so much of the findings and sentence as are correct in law and fact. Art. 66(c), UCMJ, 10 U.S.C. § 866. In determining the "factual sufficiency" of a finding, we must ourselves be convinced beyond a reasonable doubt of the appellant's guilt, taking into account the fact that we were not present when the evidence was presented. *United States v. Turner,* 25 M.J. 324, 325 (C.M.A. 1987).

I broadly accept the majority's recitation of the facts. I further accept their statement that his case can rightly be described as tragic. I note that Machinist' Mate Fireman Recruit (MMFR) [S], the deceased, used a considerable amount of cocaine and heroin over the course of just a few hours, in amounts so high that testing equipment in a toxicology laboratory simply fixed the amount at "greater than" a certain concentration. After ingesting the heroin, MMFR [S] soon began to mumble incoherently and

to nod off to sleep; the appellant at that point tried to speak with MMFR [S] and to rouse him, but to no effect.

The appellant initially thought he should summon emergency help, but he feared that his own drug use would be discovered and he instead asked Shorty to drive him and MMFR [S] to a hotel where a number of other junior Sailors had gathered. Once at the hotel, the appellant left MMFR [S] in the grass near the edge of the parking area. MMFR [S] was still mumbling, incoherent, and largely unresponsive to the appellant's attempts to engage him. The appellant went in to the hotel, socialized, and came back out after some amount of time to check on MMFR [S], who at that point was completely unresponsive. The appellant socialized some more and again checked on MMFR [S], who again was unresponsive. Several hours later, a passerby noticed MMFR [S] and summoned emergency authorities. The emergency authorities determined that MMFR [S] was, in fact, dead, and transported the body to the local medical examiner's office. The medical examiner fixed the cause of death as acute heroin and cocaine intoxication and estimated that the time of death was some time in the early morning of 20 July, probably 4–6 hours before the passerby discovered the body. It was unclear when death occurred relative to the appellant's arrival at the hotel and subsequent trips to check on MMFR [S].

After the dead body was discovered, local police began an investigation, and the appellant's actions during the course of the investigation led to the obstruction charges against him. There is no link, explicit or implicit, between the conduct giving rise to the obstruction charges and the demise of the deceased.

The key element to proving negligent homicide is whether the act or omission of the appellant amounted to simple negligence, that is, the lack of care of the safety of others which a reasonably careful person would have exercised under the same or similar circumstances. Assessing this element involves examining substantive military law which in turn rests on military tradition, necessity, and experience. *United States v.*

*Martinez,* 42 M.J. 327, 330 (C.A.A.F.1995). Because I am not convinced beyond a reasonable doubt that the appellant's acts or omissions in this case breached this standard, *see United States v. Lingenfelter,* 30 M.J. 302, 307 (C.M.A.1990), I would disapprove the guilty finding for the negligent homicide.

I recognize and support the duty, forcefully expressed in *Martinez,* for all members of the Armed Forces to take care of themselves and their fellow warriors. 42 M.J. at 330 n. 5. This duty includes the need to summon law enforcement or medical help when the circumstances warrant. I nonetheless am unwilling to attach criminal liability in this case to a service member who failed to prevent his liberty buddy from engaging in criminal activity that led to the buddy's death. The appellant's failure to prevent the deceased from using illegal drugs, therefore, cannot be viewed as a negligent act or omission that led to his death. The question then becomes whether the failure to summon emergency care played a material role in the death of the shipmate. *Lingenfelter,* 30 M.J. at 307.

The medical examiner who testified for the Government noted that both cocaine and heroin were present in lethal amounts, an opinion seconded by the defense toxicology expert. The Government witness testified that a drug available to emergency responders, Narcan, could have reversed the effect of an opioid such as heroin. The medical examiner cautioned, however, that the Narcan would have had no effect on any damage caused by cocaine. He also could not say with certainty that resolution of the heroin-induced physical problems would have made the cocaine-induced problems so obvious that they could have been effectively treated to reverse the effect of the cocaine.

The Government also offered evidence from a member of the local rescue agency who examined the body; that responder had been trained to administer Narcan. The Government did not introduce any evidence, however, that the appellant was aware of the capabilities of the local EMS or the effect of Narcan. *Cf. United States v. Lawson,* 36 M.J. 415, 423–24 (C.M.A.1993)(Wiss, J., concurring)(in dereliction cases, tailor duty to

knowledge and experience of person allegedly in breach). No witness testified, moreover, that administration of Narcan would absolutely have saved the life of the deceased; the tenor of the testimony was simply that the Narcan would make the effect of the heroin manageable.

It is also unclear from the state of the evidence before us whether the appellant even recognized his liberty buddy's extreme state of distress. The Government offered no evidence from which I can conclude that the appellant had any specialized medical or emergency training, that he had familiarity with the effects of cocaine or heroin on other persons, or that he believed the sleepiness and later unresponsiveness demonstrated by the deceased were anything other than reactions one might expect, especially in light of Shorty's observations that those reactions were in fact normal. I return as well to the point that cocaine and heroin were both present in the deceased in lethal amounts; if the amounts were in fact lethal, and the question was merely one of how long it would take the doomed Sailor to die, then no amount of emergency aid, however quickly rendered, would have availed the deceased. In this regard, I note that the death certificate, Prosecution Exhibit 5, cites the cause of death as cocaine and heroin intoxication, and puts the interval between onset and death at "minutes". No testimony was offered to put this exhibit into some sort of context—e.g., whether the "interval" referred to the amount of time that passed between the body's metabolizing the substance to a lethal concentration and death or whether it instead referred to the amount of time between ingesting a lethal amount and the death.

I do not mean, in reaching this conclusion, to suggest that the appellant's actions were what should be expected of a shipmate or liberty buddy. I return again to the sentiments expressed in *Martinez* about the higher standard to which service members are rightly held. I am simply not satisfied beyond a reasonable doubt that the appellant's acts or omissions played a material role in the death of his liberty buddy.